LEHNEN *v.* RYAN.

1. CHATTEL MORTGAGES—SALES—FORECLOSURE—INSECURITY CLAUSE.
   Under a conditional contract of sale, in the nature of a
   chattel mortgage, whereby the vendor transferred to com-
   plainants a business and its assets upon an agreement to
   pay monthly installments, and providing that 90 per cent. of
   the net profits should be turned over to the vendor in
   addition to the specified installments but which contained
   no clause authorizing the vendor to declare the entire
   amount of the purchase price due and payable in case of
   default, the vendor was not authorized to take possession
   of the property under the usual insecurity clause where
   there was no evidence that a default had occurred in pay-
   ing over profits of the business to the vendor or that any
   such profits had been made, and where, also, upon taking
   possession of the business the vendor secured about $350
   in cash from complainants, which more than sufficed to

pay any amounts due under the stipulations of the agreement.[1]

2. SAME.

Held, that the evidence did not establish defendant's contention that he was not secure.

3. SAME—INJUNCTION—RESTRAINING UNLAWFUL SALE.

The vendee, on filing a bill of complaint setting up a threatened sale of the business by the vendor, was entitled to an injunction restraining the premature foreclosure by public sale of the entire property.

4. SAME—ADEQUATE REMEDY AT LAW—EQUITY.

Where complainants' business was a going one that had been purchased by them under an agreement authorizing them to conduct the business, which consisted in part of valuable good will, and defendant's action in taking possession for the purpose of selling, injured or destroyed it, and where he had no right to do so under the provisions of the contract, the court of equity obtained jurisdiction of the question in issue for the purpose of restraining the threatened illegal action and was authorized to proceed to an accounting and a complete disposition of the controversy; the remedy at law could not be considered adequate in such sense as to oust equity of jurisdiction.

5. INJUNCTION—BOND.

No bond to secure defendant against loss by the injunction proceeding under section 502, 1 Comp. Laws (4 How. Stat. [2d Ed] § 12020), was required as a condition to the issuance of the restraining order since the statute relates to a suit or action at law pending, not to the seizure of property by the defendant under a chattel mortgage clause in a contract of sale.

Appeal from superior court of Grand Rapids; Stuart, J. Submitted January 11, 1915. (Docket No. 58.) Decided March 18, 1915.

Bill for injunction by Matthias Lehnen and others against Otis H. Ryan to restrain a foreclosure and

---

[1] Upon the rights and liabilities of vendor and purchaser by conditional sale on default of payment, see note in 32 L. R. A. 455.

sale of personal property and assets of complainants. From a decree in favor of complainants, defendant appeals. Affirmed.

*Carroll, Kirwin & Hollway,* for defendant.

*Joseph Renihan,* for complainants.

STONE, J. The bill of complaint in this cause was filed to obtain an injunction and for an accounting. The defendant had for many years prior to July 8, 1911, been engaged in the business of teaming and general excavating work in the city of Grand Rapids on a large scale, owning and employing in such work from 50 to 60 horses and a large number of wagons and other necessary equipment. This business had latterly been conducted under the name of the Reliable Transfer Company, a corporation, whose capital stock was owned by defendant. Having met with an accident resulting in the loss of his eyesight, he entered into negotiations with the complainants, Matthias Lehnen, the father, and the other three complainants, his sons, for the sale of said property and business. The negotiations resulted in the following agreement, viz.:

"This agreement, made the 8th day of July, 1911, between Otis H. Ryan, of the city of Grand Rapids, county of Kent, and State of Michigan, party of the first part, and Matthias Lehnen, Peter Lehnen, Jacob Lehnen and Joseph Lehnen, all of the same place, parties of the second part, witnesseth:

"(1) That said party of the first part, for and in consideration of the sum of twenty-two thousand, five hundred and seventy-seven and fifty one-hundredths dollars ($22,577.50), lawful money of the United States, to be paid as hereinafter mentioned, has contracted and agreed to sell to the said parties of the second part, and the said parties of the second part have agreed to purchase, the barn building located at 53 Ellsworth avenue, in the city of Grand Rapids, also the hotel, furniture and fixtures as contained in

an inventory attached hereto, marked Exhibit B, and all the capital stock of the Reliable Transfer Company, a corporation of Michigan, which said capital stock is owned by said party of the first part, an inventory of its property being hereto annexed and marked Exhibit A.

"(2) The said parties of the second part may forthwith take possession of said property and they do hereby agree to pay the said purchase price as follows: Two hundred and eight dollars and thirty-three cents ($208.33) on the fifteenth day of August, 1911, with interest on said principal sum at the rate of six per cent. per annum, and a like sum of two hundred and eight dollars and thirty-three cents on the fifteenth day of each and every month thereafter with like interest on so much of said purchase price as remains unpaid each month at six per cent. per annum until the whole of said purchase price is fully paid. It is also agreed that at the end of each month, so long as said purchase price or any part thereof shall remain unpaid, an examination of the books and a trial balance of the business done by said parties of the second part, shall be taken by the bookkeeper, hereinafter mentioned, and after deducting from the gross receipts all wages, repairs, cost of replacing or recovering any of said property and all other expenses incident to said business of said parties of the second part, they shall, in addition to the above monthly payments, pay to said party of the first part, upon such purchase price, ninety per cent. of the net profits of the business each and every month whenever any of said month's said net profits shall exceed the sum of two hundred and eight dollars and thirty-three cents, provided, however, that said parties of the second part shall pay at least twenty-five hundred dollars of said purchase price each and every year until the same is fully paid. And it is further provided, that only one hundred dollars and interest shall be paid in the months of January, February, March and April, at the option of said second parties, and the said parties of the second part, for themselves, their heirs, executors and administrators covenant and agree to pay said party of the first part, his representatives or assigns, the said several sums of money as they severally become due with interest

thereon as above provided, without any deductions, taxes or assessments whatever. And they further agree to and with said party of the first part to pay and discharge within the time prescribed by law, all taxes and assessments either regular or special which may be levied by the United States, State of Michigan, county of Kent, or the city of Grand Rapids, or by any lawful authority, on said property during the time the said purchase price remains unpaid. And said parties of the second part further covenant and agree to and with the said party of the first part to keep said building and property insured for not less than ten thousand dollars ($10,000), with insurer or insurers to be approved by said party of the first part. Loss if any to be paid to said party of the first part as his interest may appear and the policy or policies of insurance shall remain in the possession of the said party of the first part. And the said parties of the second part further covenant and agree to and with said party of the first part to keep the said stock and property, or a stock equal in amount and value to the said stock and property, at all times until the full amount of said purchase price and interest thereon has been fully paid. Or if any of the stock or property is sold its selling price is to be paid to the said party of the first part and to be applied on the amount of this contract, or at the option of said party of the first part, other stock or equipment equal in value is to be purchased, and which will be subject to the terms of this contract, but none of said stock or property shall be sold by said parties of the second part, so long as said purchase price remains unpaid, without the written consent of said parties of the first part.

"(3) Said parties of the second part covenant and agree to retain and hire William Ervine as bookkeeper at the sum of twenty dollars ($20.00) per month, whose duty it is to strike a trial balance each month on the books of said parties of the second part and to keep the book of said parties of the second part in balance and to give to the said party of the first part a copy of such trial balance so struck as aforesaid. Said Ervine shall be discharged for cause only, and in the event of such discharge, said party of the first part shall have the right to choose his

successor. And it is further covenanted and agreed between the parties to these presents that if default be made in the payment of taxes and assessments, or any other duties as shall by lawful authority be imposed upon the said property above described, the said party of the first part, his heirs, executors, administrators and assigns may pay and discharge such duties, taxes and assessments and the moneys thus paid are to be a lien on the said property added to the amount secured by this contract and be payable forthwith with interest thereon at the rate of 6 per cent. per annum. It is further agreed by the parties to these presents that if the said parties of the second part fail to get the building and property insured, as aforesaid, against loss and damage by fire and in the amount and manner provided by the said party of the first part, his heirs, administrators, executors or assigns, that then the said party of the first part may effect such insurance and pay the premium or premiums for effecting the same and said premium or premiums so paid shall be a lien upon the said property added to the account secured by this contract and be payable forthwith with interest at the rate of 6 per cent. per annum.

"(4) And it is further agreed by the parties to this contract that until the said parties of the second part have paid one-half (½) of the face value of this contract, or eleven thousand and two hundred and eighty-eight dollars and seventy-five cents ($11,288.75), with interest, each of the said parties of the second part shall not draw in excess of twelve dollars ($12.00) a week as salary, provided and upon condition, however, that each of the parties of the second part is to put in full time working for the interests and in behalf of the business transferred and sold by these presents, and in the event of their not working as aforesaid, a proportionate amount based upon the period of such idleness is to be deducted from the amount that the one so laying off is to receive except when such item is occasioned or caused by sickness.

"(5) It is hereby understood and agreed that so long as said purchase price and interest thereon remains unpaid, title of said property shall be and remain in the said party of the first part, and if default is made in said payments due hereunder, or in any

of them at the time and in the manner the same are made payable, the said party of the first part is hereby authorized to sell at public auction, after the like notice as is required by law for constable sales, the goods, chattels and personal property hereinbefore mentioned or so much thereof as may be necessary to satisfy the said debt, interest and reasonable expenses and to retain the same out of the proceeds of such sale, the overplus or residue, if any, to belong to and to be returned to the said parties of the second part, and the said party of the first part, his heirs, executors, administrators and assigns is hereby authorized at any time, when he shall be himself unsecured or if the said parties of the second part shall sell, assign or dispose of, or attempt to sell, assign, or dispose of the whole or any part of the said goods, chattels and personal property, hereinbefore mentioned, or remove or attempt to remove the whole or any part thereof from said premises without the consent in writing of the party of the first part, then and from thenceforth it shall and may be lawful for the said party of the first part, his executors, administrators or assigns, or his or their authorized agents, to enter upon the said premises of the said parties of the second part, or any place or places where the said goods, chattels and personal property or any part thereof may be, and take possession thereof and the same retain in some convenient place at the risk and expense of said parties of the second part until the said sum of money shall become due as aforesaid and then dispose of the same in the manner above provided.

"In witness whereof, the parties thereto have hereunto set their hands and seals the day and year as above written."

This agreement was duly signed and acknowledged by the parties.

The bill of complaint states that, to secure the faithful performance of said contract, complainant Matthias Lehnen and wife, on the said 8th day of July, 1911, made and executed to the defendant a certain real estate mortgage in the sum of $2,000, covering certain property in the city of Grand Rapids; and

that the other complainants, on the same day, made and executed to said defendant a certain chattel mortgage in the sum of $2,120, covering eight horses and certain larries, wagons, and other property in their possession; that on said day the complainants took possession of said property and business specified in said contract and assumed the active management and operation thereof, and continued the operation and management thereof, until the close of the 6th day of November, 1911; that during that time they performed each and every act, deed, and thing in said contract covenanted to be performed by them; that on November 7, 1911, the said defendant, with the aid of a deputy sheriff, entered upon said premises and took possession of the property and business specified in said contract, together with the cash on hand, book accounts, bills receivable, and other papers and things relating and pertaining to said property and business; and that ever since said last-named date the defendant had been continuously in active charge and control of said property and business; that he had assumed and exercised the active, exclusive control and management of said property and business specified in said contract; that from the 7th day of November, 1911, down to the time of filing the bill of complaint, which was November 15, 1911, said defendant had written, notified, and commanded the various debtors of complainants not to pay their accounts to complainants, but had commanded the said debtors to pay the said accounts to the defendant; that in the meantime said defendant had collected large sums of money due and payable to complainants, which said defendant had neglected and refused to turn over to complainants or account for; that said defendant asserted and pretended that he had taken charge of the property and business mentioned in said contract for the reason that he was unsecure in the several payments as they

became due and payable according to the terms of said contract, whereas complainants claim the contrary to be true, they alleging that the defendant was amply secured in the payment of the several payments mentioned in said contract as they became due and payable according to the terms thereof; that said property and business was purchased at the true and actual value of said property, as indicated by said inventory accompanying the contract; that said defendant since taking possession of the property and business, as aforesaid, had published notices to the effect that on November 15, 1911 (the day of the filing of said bill of complaint), he would sell, or cause to be sold, all of the property, goods, chattels, and effects listed, specified, and mentioned in the said inventory attached to said contract of sale; that complainants had repeatedly, but in vain, requested the defendant to turn over to them the management, operation, and control of said property and business, together with the books of account, accounts payable and receivable, and all moneys and other things in any wise pertaining to the management of said business under said contract, and render a true and perfect account of all moneys and properties taken by the said defendant from their possession as aforesaid, together with moneys collected by the defendant; that they had kept during all the time they had possession of said property a true and correct account of all business transacted; that the bookkeeper employed in said business had rendered a true and correct statement of the business carried on and the condition thereof, and said defendant had full access to the books of account from time to time, as provided in said contract, and had at all times been in possession of knowledge of the conduct, nature, and extent of the business so transacted, and the condition and management thereof; that at the time said defendant took possession of said prop-

erty and business complainants had outstanding bills
due them amounting to upwards of $2,000 upon the
books of said company, which said defendant had
taken possession of; that he had collected a large por-
tion thereof and converted the same to his own use;
that said defendant had in an arbitrary manner taken
possession of other property than that specified in said
contract belonging to complainants, and on demand
refused to turn the same over to them; that he still
held the said real estate mortgage and the collateral
chattel mortgage above referred to.

The bill prays for an injunction restraining the de-
fendant from selling and disposing of said property,
and also prays for a decree holding that the said de-
fendant was unlawfully in possession of said property
and business, and that he render and come to a true
and perfect accounting as to all moneys received and
collected by him belonging to complainants, and to
give them free access to the books and to the other
papers relating and pertaining to said property and
business, and there was a prayer for preliminary in-
junction.

The answer of defendant admits the making of said
agreement and the collateral mortgages above re-
ferred to. The answer also states that defendant had
learned that the title to the real estate covered by said
mortgage given by Matthias Lehnen and wife was
incumbered for taxes, and had been sold and deeded
to the city of Grand Rapids for certain delinquent
taxes; that the property covered by the said collateral
chattel mortgage was not worth to exceed $750; and
that the same was also incumbered by a previous lien.
Especially the said answer denied that, during the
time complainants had possession and control of said
property and business, they did and performed every
act, deed, and thing in said contract and mortgage
covenanted and agreed by them to be done and per-

formed, and that they had made default as follows:

(*a*) With reference to said collateral mortgages as above referred to.

(*b*) That said complainants failed and refused to maintain insurance on said property mentioned in the contract and mortgage, or to pay the insurance companies the premiums due upon the policies of insurance. That said insurance companies threatened to, and were about to, cancel said policies, and for his own protection defendant was obliged to, and did, pay said insurance companies premiums to the amount of $125 in order to keep said policies in force.

(*c*) That said complainants had failed and refused to keep the stock and property described in said contract and mortgage, or a stock in equal amount and value to said stock and property, but, on the contrary, allowed said wagons, harness, and other property to be and remain out of repair, and had mistreated and overworked said horses and did not provide them with proper food, to such extent that four of them had died, and the remainder of them became so poor and run down and unfit for work that the humane agent of said county had ordered that 13 of said horses should not be worked until such time as they were in proper condition. That said complainants did not replace the four horses that died with other horses of equal value, but did bring two old horses of less value than any of said horses that died. That, when defendant attempted to take possession, complainants removed said two horses and now have the same in their possession, and that by reason of complainants' ill treatment and want of care of said stock and property the same had depreciated in value to the amount of $6,500 and upwards, and that the said property in its then present condition would not sell for, and was not worth in excess of, $16,000.

(*d*) That complainants did not make the payments due on said contract and mortgage as they had covenanted and agreed to do, but were in default. That complainants had made payments on such contract and mortgage as follows: July 1, 1911, $50; August 18, 1911, $350.03; September 28, 1911, $319.03; October 1, 1911, $252—making a total of $971.06. That they did not make the payments due defendant under

the terms of said contract, but fraudulently and deceitfully attempted to deprive him of the same by keeping a portion of the earnings of said business off their books, collecting the same and appropriating them to their sole use, and by improperly keeping their books so that the same did not represent the amount of business which was being conducted, all for the purpose of depriving defendant of a portion of the earnings due him under said contract. And that without cause they had discharged the bookkeeper mentioned in said contract, and had employed another who would not inform defendant of the condition of the affairs of said business.

(*e*) That complainants failed and neglected to put in their full time in working for the interests of, and in behalf of, said business; but, on the contrary, certain of said complainants spent a large portion of the time while they were in possession of said property in idleness, and in drinking and carousing in saloons and other places.

The answer admits that defendant took possession of the property as alleged, but avers that he did not take possession of all the cash on hand, or accounts, bills receivable, and other papers and things, but only such portions thereof as were found in the office, and claims that certain cash, accounts, and papers belonging to said business had not come into defendant's possession, but had been concealed by complainants; that complainants had made default in said contract which justified defendant in taking possession of said property, business, and accounts. The answer states that defendant took possession of said property and business for the reasons that defendant was unsecured in the several payments as they became due and payable according to the terms of the contract. He admits the publication of notice of sale as alleged, and claims that he had a legal right to sell. The answer claims the benefit of a demurrer upon the following grounds:

(*a*) That complainants have not stated such a case in their bill as is cognizable in a court of equity.

(*b*) There is no equity on the face of said bill, in that complainants have not offered to pay the purchase price of said property in the possession of defendant, or to secure the payment of the same.

(*c*) That complainants have a complete and adequate remedy at law.

A preliminary injunction had been issued upon the filing of the bill restraining the sale of the property. Upon the coming in of the answer a motion was made to dissolve. It was ordered dissolved upon defendant giving a bond in the penal sum of $3,000, conditioned that said defendant should promptly comply with, pay, and discharge any decree that might be rendered against him. Such bond was given, and the property was again advertised for sale; was sold and bidden in by defendant for the sum of $15,000. No part of the proceeds of the sale was offered or tendered to the complainants, but they had been notified by defendant that upon payment of $15,000 the property would be restored to them.

The case, being at issue, was heard upon evidence taken in open court. The court found, among other things, in and by its decree, that the whole contract did not fall due at the time defendant seized possession of the said goods and chattels; that the sale made by defendant through seizure was premature and unlawful, and without right under the terms of the agreement; that the money on hand, taken by defendant at the time of the seizure, belonged to complainants; that the bills receivable seized, and the accounts collected, were the property of complainants; that nothing had ever become due on the chattel mortgage or real estate mortgage given by complainants to defendant as additional security; and that the several debts contracted by complainants in conducting the business had not been paid. The decree ordered the

defendant to account for the money which he took at
the time of the seizure, and also for the amount of
money collected on the bills receivable for work done
by complainants, and that, out of this money, debts
owing at the time of the seizure by complainants and
incurred while doing the business be paid by defend-
ant out of the moneys so seized and collected and, if
not sufficient to pay in full, that the same be prorated.
The court found that the defendant, at the time of the
seizure, took in cash, or its equivalent, $345.41, and
that the defendant had collected since the seizure the
sum of $493.30. It also found the value of the prop-
erty taken by defendant, and not restored to complain-
ants, covered by the chattel mortgages as additional
security, to be a certain sum therein specified, and pro-
vided for certain offsets, and determined the amount
that should be paid by defendant to complainants.
The defendant has appealed.

A large amount of testimony was taken in the case,
as appears by the lengthy record. The testimony on
some points in issue was very conflicting.

The instrument above set forth was a contract, in
the nature of a chattel mortgage. It was prepared,
according to the evidence, by the attorneys for the
defendant, and there is no claim that the defendant
did not fully understand its terms. A perusal of the
instrument will disclose some peculiarities. It pro-
vides, in addition to the monthly payments, that at the
end of each month, so long as the purchase price or
any part thereof remained unpaid, a trial balance of
the business done by said complainants should be
taken by the bookkeeper of complainants mentioned
in the contract,—

"and after deducting from the gross receipts all
wages, repairs, cost of replacing or recovering any
of said property, and other expenses incident to the
business of said parties of the second part, they shall,
in addition to the above monthly payments, pay to

said party of the first part, upon such purchase price, 90 per cent. of the net profits of the business each and every month, whenever any of said month's said net profits shall exceed the sum of $208.33; provided, however, that said parties of the second part shall pay at least $2,500 of said purchase price each and every year until the same is fully paid."

It was provided, also, as follows:

"And the said parties of the second part further covenant and agree to and with said party of the first part to keep said stock and property, or a stock equal in amount and value to the said stock and property, at all times until the full amount of said purchase price and interest thereon has been fully paid."

The last clause of said instrument is also significant. An examination of this clause of the contract shows that there is no provision authorizing the defendant to declare the whole sum secured by the contract due, in case of default in payment of any installment or interest. In case of default he was authorized to sell such property, or so much thereof as might be necessary to satisfy the said debt, interest, and expenses, and to retain the same out of the proceeds of such sale; the overplus or residue, if any, to belong to and be returned to the complainants. In case defendant was unsecure, or in case of attempt to sell, etc., any part of the property by complainants, defendant might take possession of the property, "and the same retain in some convenient place at the risk and expense of said parties of the second part until the said sum of money shall become due as aforesaid and then dispose of the same in the manner above provided."

From defendant's answer it appears that there had been paid upon the contract at least the sum of $971.06. At the time of the seizure defendant found and took in cash, or its equivalent, substantially $350. This sum applied upon the contract would have more than paid any installment then due, and the interest

on the contract. This being so, the right of the defendant to proceed to advertise the property for sale and to sell it is not apparent.

We find no clause in the contract authorizing the defendant to take possession of the bills receivable of the complainants. There was a good deal of evidence, pro and con, upon the hearing as to whether the defendant was really unsecured. The trial court evidently found that, as matter of fact, he was not unsecured.

There was also a sharp conflict in the evidence as to whether or not the property had deteriorated in value while in the possession of the complainants and whether they had properly cared for the same. The trial court also evidently found in favor of the complainants upon this question. Whether this finding was correct or not is not controlling here, for in any event the defendant had no right to proceed to sell the entire property, and hold the proceeds thereof.

Referring to the premiums due on insurance, we are satisfied that defendant did not pay these amounts until after he had seized the property. The policies had not been canceled.

Considerable testimony was taken upon the subject of the keeping of the books, and it is quite evident that they were not perfectly kept, but we have looked in vain for any evidence to show that the gross receipts were such that there was any net profit of the business that would entitle the defendant to the 90 per cent. thereof referred to in the contract. It does appear that the complainants contracted for, and were owing a large sum of money for, feed and supplies purchased for the care of the horses and stock while they were in charge of the same. The proofs are left in such condition that we cannot determine what amount, if any, might rightfully have been claimed by the defendant under this clause of the

contract. The defendant himself testified that at the time he seized the property he made no claim that complainants were in default as to the 90 per cent. clause of the contract.

The business was a going one, and it had been purchased by the complainants under a contract in which they agreed to pay a large sum therefor, and the evidence shows that the good will of the business was a large item in the contemplation of the parties in making the contract. This business of the complainants, so far as they are concerned, was not only interrupted, but was destroyed, by the seizure and sale of the property by the defendant. If defendant had no right to seize and proceed to sell the property at the time he did, and if the threatened sale was premature, these facts, we think, gave the right to complainants to file an injunction bill. The court, having obtained jurisdiction, had the right to proceed to an accounting between the parties, and to make the orders with reference to the injunction. It made such orders, by first enjoining the sale, then permitting it to proceed upon the giving of a bond by defendant. See *Hall* v. *Nester*, 122 Mich. 141 (80 N. W. 982), where similar action was had.

Whether complainants were entitled in the case to recover damages for the breaking up of their business is not necessary for us to consider, because the trial court awarded no sum in that regard, and the complainants have not appealed.

Counsel for defendant, in their brief, claim that the injunction proceedings were void because the bond provided for, by section 502, 1 Comp. Laws (4 How. Stat. [2d Ed.] § 12020), was not furnished. We do not agree with counsel upon this point. The statute contemplates the filing of a bond in case a suit or personal action at law is pending. We do not understand that the seizing of this property by virtue

of the contract, in the nature of a chattel mortgage, was such a suit at law as to make the bond necessary.

It is next claimed by defendant's counsel that, under the demurrer clause of the answer, the court should have dismissed the case on the ground that there was an adequate remedy at law. We think the court had jurisdiction for the reasons already stated.

Counsel for defendant also urge that defendant at least should have been given credit for certain sums of money found to be due complainants on the Century Fuel Company account, and other like accounts. We cannot agree with this contention. The defendant would not be entitled to those sums, or to any sum, unless the record showed, which it did not, that the net profits had been such as to give him the percentage provided for in the contract. We think that the equities of the case are with the complainants.

The sum awarded to the complainants by the court below, under the circumstances of the case, is a small one, and one of which we think the defendant cannot here justly complain; and, as we have said, the complainants are in no position to claim a larger sum.

A careful examination of the record has led us to the conclusion that the decree of the court below should be affirmed, with costs to the complainants. It is so ordered.

BROOKE, C. J., and MCALVAY, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.